[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff in this action seeks a dissolution of marriage, alimony, counsel fees, and a distribution of the parties' real and personal property, and other appropriate equitable relief. Both parties were present during the course of the trial and were represented by counsel.
The following jurisdictional and factual findings are made. The parties intermarried at Northfield, Vermont, on January 11, 1992. Both parties have resided in the State of Connecticut for longer than twelve months next preceding the filing of the complaint. There are no minor children issue of the marriage and no governmental agency is contributing to the support of either party.
There is ample evidence that the marriage has broken down irretrievably and it is ordered dissolved on those grounds.
The plaintiff's maiden name of Donna Jo McCalla is ordered restored to her.
In determining the issues of alimony, distribution of assets and other financial orders, the Court is cognizant of and has considered the provisions of Connecticut General Statutes §§46b-81 and 46b-82. The considerations of § 46b-81 include the length of the marriage, the causes for the breakdown of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, and the opportunity of each for future acquisition of capital assets and income, the contribution of each the parties in the acquisition, preservation or appreciation in value of their respective estates.
With respect to the issue of alimony, § 46b-82 provides that many of the same considerations apply, but also instructs the Court to consider any award it makes pursuant to § 46b-81 in assigning or distributing property between the parties. CT Page 13327
While the Court is not required to give equal weight to any factor in its equitable determination of these disputed matters, it is required to consider each in putting together the mosaic which results from those equitable considerations.
This is a relatively short marriage. They married in January 1992 and have lived apart since approximately March 15, 1996. The plaintiff ascribes the reason for the breakdown to the defendant's abusive behavior while the defendant denies being abusive and blames the plaintiff for trying to control or dominate their relationship. They do, however, agree that they argued frequently, usually over money. While the reasons for the breakdown are more complex than whether abuse occurred, the court does conclude that the defendant was indeed abusive to his wife. That abuse did not necessarily take the form of physical battering but for the most part were angry tirades, belittling comments, name calling and unexpected explosiveness intended to make the plaintiff subservient. There were, at times, some physical aspects to their arguments as well. The defendant would push her chest with his fingers, shove her and in one instance placed his hands on her neck. In another instance he held her nostrils closed while she was asleep (his explanation was he was trying to stop her snoring) but she awakened suddenly and was very frightened. There were other instances, but the pattern of abuse was established, not only by the plaintiff's testimony, but by the corroborating testimony of others, including Patricia Higgins, a friend of the plaintiffs for fifteen years who, on two occasions had her telephone calls to the plaintiff interrupted by the defendant hanging up the telephone. She described the defendant's attitude toward his wife as "indifferent". Others also credibly testified that the plaintiff was clearly fearful of her husband.
The parties met when on vacation in the Bahamas in 1990. The plaintiff, who had three prior marriages, had a son from an earlier union. He was born in October 1978. (This was the defendant's first marriage). In 1990, the plaintiff owned her own home in Dayton, Ohio and she was working for Reynolds Reynolds, a computer company in Dayton and earned approximately $60000 annually. She has a Masters Degree in Medieval Jewish History and is 47 years of age.
When they married, the plaintiff was able to get a transfer to Connecticut, but took a pay cut to some $35000 per year, and her job here required extensive traveling. She sold her home in CT Page 13328 Dayton and netted approximately $22000 from that.
The husband, age 40, is an engineer at Pratt Whitney earning approximately $60000 annually. He has a degree in aeronautical engineering and an MBA as well. His health is good. The plaintiff has a history of depression for which she has been treated. She is emotionally fragile, but has a history of employment (at present she is unemployed) and should be able to find an appropriate job within a reasonable period of time.
Both parties have submitted proposed orders for the court's consideration. Other facts will be discussed in connection with the orders entered by the Court.
1. Real Estate:
The defendant shall transfer all of his right, title and interest in the marital home located at 146 Old Colchester Road, Hebron, Connecticut to the plaintiff wife. The plaintiff shall be solely responsible for the mortgage, real estate taxes, insurance and other expenses in connection with the real estate and shall hold the defendant harmless therefrom. The wife shall make reasonable efforts to refinance the existing mortgage to remove the husband's name as a mortgagor. Until said refinancing occurs, the wife shall pay alimony in the amount of $1.00 per year and, in the event the obligation to pay the mortgage by the wife is discharged in bankruptcy and, as a result of such discharge, a third party makes a claim against the husband for repayment of the mortgage obligation, the making of such claim shall constitute a change in circumstances warranting a modification of the $1.00 per year alimony obligation, only to the extent that the husband is paying the discharged debt. This alimony is otherwise non-modifiable.
The Court finds this real estate has a fair market value of $157500. There is a mortgage balance of $124362, thus the equity is approximately $33000. The house was purchased in January 1993 for $165000. The defendant proposes that he be credited for moneys he expended for renovations, mortgage, utilities and other costs he claims he expended. On the other hand just about all of the money used for the down payment came from the wife or her mother, vis: $20500 (proceeds from the sale of her Ohio home); $10000 (a gift from Donnie McCalla); $5000 (loan from Donnie McCalla — which was repaid from the wife's account). In addition Donnie McCalla later gave them $3000 for roof and driveway CT Page 13329 repairs.
Although the husband did contribute to the improvements to this asset, the wife did also and her salary generally went to household expenses as well. Weighing all the circumstances, including the reasons for the breakdown, the court declines to apportion any of the equity in this asset to the defendant.
2. Automobiles:
The Toyota Supra shall belong to the husband. The Mercury Villager shall belong to the wife. The parties shall effectuate any paperwork necessary to accomplish any required transfer of title. The Villager was purchased during the marriage. The plaintiff's pre-martial vehicle was traded in and $19800 was financed. That note has been paid off. It has a present value of approximately $8000. The defendant's vehicle (1987 Toyota) has a present value of approximately $3000, however at the time of the marriage the defendant owed approximately $6000 on that car, which was paid off during the marriage.
3. Investments:
Both parties had pension plans, IRA accounts and 401K plans at the time of their marriage. Both continued to make deposits to those accounts during the marriage from their respective salaries.
The wife shall retain full interest in her Reynolds Reynolds pension, her 401K and her IRA account. (The 401K and IRA total approximately $72500).
The husband shall retain full interest in his Pratt Whitney retirement account, his 401K and IRA accounts. (His 401K and IRA total approximately $121500).
In view of the other orders entered herein and to partially offset awards to the wife the joint Prudential Bache Fund shall be transferred to the husband. The total value of this asset is approximately $8200.
With respect to the Rausher Pierce Refsnes, Inc. account in the approximate amount of $48000, the defendant argues that this is a marital asset and seeks the assignment of a portion of that account to himself. During the course of the marriage the wife CT Page 13330 filed a claim against her employer, Reynolds Reynolds for negligent and/or intentional infliction of emotional distress, defamation, sex discrimination and constructive discharge, violation of the Americans with Disabilities Act and retaliation for filing a worker's compensation claim. The matter was settled in November 1995 for $64130 — $14130 by way of a severance payment for lost wages and $50000 as compensatory damages for her claims. This money was placed by the plaintiff in an account with Rausher Pierce Refsnes solely in her name. She withdrew some funds, some $7000 for legal fees and $8000 to repay loans from her mother.
The Court agrees that this account could be considered a marital asset, but does not agree that equitable considerations mandate a portion be distributed to the defendant.
The sum of $50000 was to compensate the plaintiff for damages personally sustained by her and the $14000 was compensation for wages from the time she left her job to the date of settlement. This settlement was within five months of the time the parties separated. (It was March 1996 when the plaintiff obtained a temporary restraining order removing the defendant from the marital home). At that time the marriage was in its terminal stages. Further, the defendant did not contribute to the value of this asset. In addition, the plaintiff who has resettled here from Ohio is presently unemployed while the defendant continues on with his steady and long term job at Pratt Whitney. There is a disparity in the opportunity the parties have to acquire future assets and income. The plaintiff had given up a job in the $60000 range for one in the $35000 range and it seems unlikely that she will soon be able to earn the higher amount again, if at all. Accordingly, the Rauser Pierce Refsnes account shall remain the property of the plaintiff.
4. Alimony:
In consideration of the other financial awards and distributions, alimony is not awarded to the plaintiff. She is collecting unemployment compensation and should be able to obtain suitable employment during the allotted period of time.
5. Medical Insurance:
The plaintiff shall be entitled to the United Technologies Corporation medical and dental plan for the remainder of the CT Page 13331 COBRA time. If she elects to do so it shall be at her expense.
6. Debts:
Each party shall be responsible for liabilities as shown on their financial affidavits.
7. Attorney Fees:
Each party has sufficient assets to pay his or her own attorneys fees. It is so ordered.
8. Personal Property:
The defendant claims, and the Court agrees, that the marital personal property has not been previously ordered divided. Most of the items taken by the defendant were his pre-marital property or clothing. He claims the following items remain in the marital home and belonged to him prior to the marriage. The following items are to be returned to the defendant if they remain in the plaintiff's possession.
 A) Silver coins and ingots removed from Mr. Chandler's car just prior to the filing for separation. The coins were purchased by Mr. Chandler on March 20, 1985 from the Free the Eagle corporation, six years prior to the marriage. The ingot was purchased in Zurich, Switzerland about 1988, three years prior to the marriage for cash.
 B) Smith Wesson .357 Magnum handgun purchased approximately 1985 for marksmanship training while in the Marine Corps. This item remained in the home in a Marine Corps. dufflebag with uniform items along with Mrs. Chandler's .25 caliber automatic pistol. Both items were removed from the dufflebag when recently returned to Mr. Chandler. In the event that Mrs. Chandler continues to deny any knowledge of this item, she is to provide a sworn statement to that effect, and the handgun will be reported stolen to the CT Page 13332 police.
 C) Two Dremel tools and associated bits etc. from Mr. Chandler's aircraft modeling equipment.
 D) Collection of foreign money accumulated during various foreign trips by Mr. Chandler dating to 1972.
 E) One ebony rhinoceros from Kenya, and one wooden Coptic Cross from Ethiopia purchased on a business trip to Africa by Mr. Chandler prior to the marriage.
 F) One antique iron with detachable wooden handle purchased by Mr. Chandler years prior to marriage.
G) Two vinyl covered backgammon boards.
 In addition the following marital personal property shall be returned to the defendant:
 A1) Poplar CD tower manufactured by Mr. Chandler.
A7) Sears table saw purchased 4/26/93
A8) Sears Plate Joiner purchased 12/3/94.
 A9) Campbell Hausfeld power compressor — purchased 5/1/93.
A12) Dewalt palm sander purchased 8/26/95
 A15) Mitsubishi U58 VCR purchased 8/11/94 Lechmere's
 A18) Two antique wash wringers, one a floor model, also on display in the laundry room.
 A20) One tanzinite stone purchased in fall 1992 by friends in Tanzania.
CT Page 13333
A22) Armed school desk purchased summer of 95.
 A27) Small nightstand with bookshelf on left side of bed in master bedroom. Refinished, and stenciled by Mr. Chandler.
 A31) Royal typewriter and black case purchased summer 94.
 B 1) Free-standing, sectional workbench in garage manufactured by Mr. Chandler.
 B 2) Two, square, wheeled wooden plant stands manufactured by Mr. Chandler.
B 3) Power washer — purchased 4/30/93.
B 4) MTD snowblower purchased August 26, 1996.
 B 5) Sears Craftsman 14" gasoline chain saw purchased 3/27/93.
 B 6) Sears Craftsman router and router sometime in late 1992.
 B 7) Ryobi detail sander purchased sometime in 1994 from Home Depot.
B 12) 1 gallon Shop Vac purchased 11/3/94.
 B 15) Sears Craftsman scroll saw purchased December, 1995.
 B 17) Several antique washboards on display in the laundry room.
B 19) Sears Craftsman belt sander.
B 24) Armed school desk purchased summer of 94.
 B 28) Two old, unrefinished white painted dressers used for storing tools etc. in garage. (photo available)
CT Page 13334
 B 32) Two antique ice cream makers purchased during marriage.
To facilitate the transfer of these items of personal property, the plaintiff shall marshal them together in an appropriate and protected place such as a garage. Arrangements should be made by the defendant to pick up said property within ten days of notification and the defendant is to arrange for a sheriff or police officer to be at the premises when the exchange is made. The parties should work through their attorney to coordinate the time of exchange.
9. Permanent Restraining Order:
The plaintiff has asked for a permanent order preventing the defendant from interfering with her liberty. The Court is not persuaded that the requested order should be granted. There was no evidence that the defendant violated the original restraining order once it was issued. The plaintiff did call the police on occasion expressing concern that the defendant was on her property, but there was no evidence to substantiate her concerns.
The parties have been separated for 18 months at this point. While their relationship is bitter and acrimonious, and while the Court does not dispute that the plaintiff's fear is genuine, there is no evidence to support her request for a permanent restraining order. The defendant appears intelligent enough to understand the consequences of any unlawful behavior toward the plaintiff. Without more than an unproven concern, a restraining order is inappropriate.
Klaczak, J.